etc. and out. We'll hear first from Mr. William Bell. Is Mr. Bell present? Mr. Bell? Mr. Bell, we are ready for your argument. May it please the Court, my name is William Bell, and I represent the appellant Ralph Arnold Smith, Jr. The main issues I would like to try to cover today, first of all, is the application of the Heck Doctrine to Dr. Smith's federal and related state claims. Did you say the Heck Doctrine? Yes, Your Honor. Heck v. Humphrey. Have you presented an argument about Heck v. Humphrey? Yes, Your Honor. In your brief? Yes, Your Honor. It's Issue 1 in our brief. Well, I might have missed it, but I was informed you might have forfeited your argument on that case, but go ahead. I have our brief right here, filed May 9. That's all right. It's Issue 1, yes, Your Honor. And our argument on that, Your Honor, in a nutshell, is that Dr. Smith's claims are temporally and conceptually distinct from the underlying involuntary inpatient commitment. The second issue . . . Well, but aren't, say, the three-month and six-month evaluations which you challenged, aren't those what kept him in civil commitment? Well, Your Honor, it's more than that, because he was, in the criminal court, in the circuit court, he was adjudicated not competent and not restorable on October 8, 2014. And that order was entered, I believe, October 15, 2014, in the circuit court. Is that order still in effect? I'm sorry, Your Honor? Is that order still in effect, that he is incompetent to proceed? It is, Your Honor. In fact, there's been another evaluation by an expert who has a contract with the state hospital. That was completed in March of this year. And we also have Dr. Philip Resnick, who is our expert on that issue. How is he going to prosecute this litigation if he's incompetent to proceed? Well, that came up in the civil case, Your Honor. And the state court's position on that was that the not competent, not restorable only applied to the criminal case, that he could still . . . So the state has a . . . still has indictments against him? Yes, Your Honor. Those indictments are still in place. But they can't proceed because he's . . . Because he's not competent and not restorable. He's not competent. Yes, sir. And . . . But he's competent enough to sue the person he tried to kill, Mr. Abraham. Well, in the civil context, the way . . . Don't you need someone appointed if you're incompetent to sue on your behalf? At least in Texas, I know that's how it is. Not necessarily because Mrs. Smith, his wife, had a power of attorney. And so she filed this case as his next friend and power of attorney, or as his agent. I believe the . . . I have the complaint in front of me. I don't see that. Well, I think the first amended complaint . . . I'm not sure she signed that one, but I'm pretty sure she signed the original complaint. And then I just . . . I signed the . . . she didn't sign the amended complaint, but I believe she did sign the original complaint. And then I tweaked it in a few places and filed the amended complaint. So that's . . . But that's how we've approached all of the civil cases, is that Mrs. Smith, as his next friend and agent, has filed and pursued these civil claims. I mean, there's even a . . . When Mr. Abraham filed his original civil suit in state court, we filed a counterclaim. And, for example, Mrs. Smith filed that counterclaim through me as Dr. Smith's agent. The second issue, Your Honor, I'd like to touch on is the status of this case. And, as far as the . . . at this early stage, this was a motion to dismiss. I believe that's the only responsive pleading. And, of course, there were a lot of joinders, both in the district court and at this level. And the . . . Going back for a second to the Heck issue, you argue that some of the claims that shouldn't be barred under Heck are the ones about getting restraints while he was in the hospital. You don't allege the attorneys had anything to do with that, do you? I mean, these private attorneys sitting in their law office, or these government attorneys sitting in the attorney general's office, what could they have had to do with what happened inside the hospital? Your Honor, the . . . One glaring example, and it's . . . I believe it's in the transcript from December 4, 2014, which was the first civil commitment hearing in Rolling Fork. Mr. Abraham's attorney, Ralph Chapman, showed up at that hearing, and I believe it's in that transcript from three years ago today, as fate would have it. Mr. Chapman represented to the chancellor that he was there to observe, and that was Mr. Chapman's own word, observe. I mean, the transcript . . . Observe a court proceeding. How does that link Mr. Abraham, who your client tried to have killed, to what happens in the hospital in terms of restraints being put on your client? Well, because at that point, Your Honor, that was December 4, so Dr. Smith had been in the jurisdiction of the Chantry Court for civil commitment for almost two months, four days, shy of two months. If you don't want to answer my question, that's fine. I'm going to. I mean, is there a direct answer or not? How could this private attorney sitting in his office, I think in Greenwood, he calls . . . I mean, what, he calls up and says, strap this guy up with belts, and they do it? I mean, is that your outlandish allegation? Well, it's not. It's more to it than that, because in a conspiracy, Your Honor, they don't write . . . people don't send out e-mails and write them on napkins. It's when they're . . . Okay. Well, under Rule 11, you have an obligation to make good-faith allegations. What's your evidentiary basis for believing that these private attorneys, one of whom you tried to have killed that resulted in the death of one of the hit men, what evidence do you have that he was in some conspiracy that involved getting your client, you know, under these restraints in the hospital? The answer to your question is, Your Honor, when Mr. Chapman showed up and represented to the Chancellor that he was there to observe, he, the Chancellor, said, everybody go meet, see if you can work something out, and they excluded me from the meeting. Mr. Chapman sat down . . . I can see why. And Mr. Spraggans, I heard them talking to Mr. Spraggans. They had some sort of speaker phone set up in there on a cell phone, and they were all . . . and the whole point of that meeting, and the reason they excluded me is because they were trying to come up with a way, we say, to continue to incarcerate Dr. Smith in jail when he's under the jurisdiction of the Chantry Court for civil commitment and he's not even supposed to be in jail. So that's because Mr. Chapman and Mr. Abraham . . . Mr. Abraham wasn't enrolling for work, but Mr. Chapman was and, in fact, sat in on this meeting with the assistant DA and the AG attorneys. All right, but my question is not whether the attorneys had something to do with him being committed. It's whether they had anything to do with what happened once he was committed in terms of the allegations you make, such as, you know, the people who saw him didn't have the proper licenses, he was strapped up. That's my question is what . . . because I think those are the things you say get around Heck v. Humphrey. Heck v. Humphrey might bar the commitment orders themselves, which maybe the attorneys were involved in that, but so what I'm getting at is this stuff that might escape Heck, which is what happened day to day in the hospital, how could these attorneys have had anything to do with that under any rational view of the world? Because Mr. Abraham and Mr. Hood are personal friends and hunting buddies, and Mr. Hood was sending these people to . . . So that's your good faith Rule 11 is that they're hunting buddies. There's more to it than that, Your Honor. That's what you started with. Because Mr. Hood sent all of these people to Rolling Fork and to other hearings even before the attorney general was in the case. And so to answer your question, there's a causal connection between all of these behind-the-scenes machinations and the fact that Dr. Smith was held in jail for months after he was supposed to have had a 72-hour hearing under the civil commitment statutes. And then as far as having him strapped down and all that, my argument to that would be, Your Honor, or response would be, that all of these people are in the causal chain of connection. They don't have to show up and say, strap the guy down. If they were involved in having Dr. Smith subjected to these unconstitutional acts, if they're in the causal chain, then they can . . . then it's fair game for them. When and where and between whom was the initial conspiracy agreed to specifically? Well, it's hard to say because it's almost all, probably all, circumstantial evidence. But it's like . . . Well, you have to make a case that there was a definite agreement by somebody to violate the law. And most everything I've read, it just concludes, like you just said, a causal connection. Why? Why is it a causal connection? Because, for instance, Rev. McMichael, Dr. McMichael, who is the chief of the forensic unit, was having contact with Ms. Eubank, for instance, who was with the Attorney General's office  She was having contact with her. Is that what you said? Yes, Your Honor, was having contact . . . Dr. McMichael was having contact with attorneys at the Attorney General's office, and specifically, for instance, Ms. Eubank, who is a defendant here . . . That's not a conspiracy. Well, it is. We say it is because, for instance, Dr. McMichael drafted an affidavit for the civil commitment hearing and the Attorney General's office didn't like it. So the Attorney General's office drafted a second affidavit saying that Dr. Smith is dangerous because Dr. McMichael didn't put that in the first affidavit. And then, for instance, Dr. McMichael was showing up in court at civil commitment hearings to testify for the Attorney General to try to keep Dr. Smith locked up with no subpoena and even though Dr. McMichael was supposed to be treating Dr. Smith at the state hospital, then he would turn around at the behest of the Attorney General and show up at these civil commitment hearings and try to keep Dr. Smith locked up. He was the doctor, a doctor anyway, in charge of your client. So why shouldn't he show up? I don't get it. Isn't he the man on the scene, so to speak? Why wouldn't his opinion about all this be important? Because the Attorney General and their effort to keep Dr. Smith locked up were using Dr. Smith's treating physician to show up in court at civil commitment hearings and testify against Dr. Smith as an expert for the Attorney General and the Attorney General wasn't even the defiant in the civil commitment case. The assistant DA had already dropped out of the case and said he wasn't going to pursue it. And so there were multiple times, and even when Tulane got involved for the risk assessment, Dr. McMichael, we found out in open court in Heinz Chantry, that Dr. McMichael was having ex parte communication about Dr. Smith with Harold Pozzetta and Mack May and maybe others at the Attorney General's office and they weren't even, now they were the attorney for the Department of Mental Health, but they weren't the defiant and we weren't involved in those conversations. So I guess a better way to say that may be it's like Thoreau said, the circumstantial evidence can be strong when there's trout, the trout is in the milk. And that's really what a lot about this case is, especially at this point where we're. . . I don't think there's any doubt about it because there's a recording. He tries to kill the lawyer who's handling his ex-wife's divorce proceeding. If he were competent, he'd spend the rest of his life in parchment prison for that. Because he's incompetent, it's not a get-out-of-jail-free card, it's a you-go-to-civil-commitment typically. And he ends up there and then he's unhappy with that. And it's just to me, you're suing anyone who possibly ever had anything to do with this guy without any attempt to tailor specific allegations to those particular defendants. Well, of course, he hasn't been convicted of anything. And he's innocent until proven guilty. And it's Jackson v. Indiana. I've cited Jackson v. Indiana more times than I could count in state court and in this court and the district court. And if someone's incompetent and not restorable and they haven't been convicted of anything, they're innocent. If they go to civil commitment, then they get the deprocess protection. They're not innocent. They just haven't been tried. I'm sorry? It's not an insanity defense. Incompetency just says you're unable to stand trial. It doesn't mean you didn't commit a crime. Well, I guess that. . . You can be completely guilty. And if you're incompetent, you can't go to trial and the government can't prove it and you can't defend yourself. Because you're not mentally capable of sitting through the proceeding. That's a big problem with this case, and that really gets back to, I think, the trout being in the milk, because the attorney general's office is the one, allegedly, who shot the guy in the top of the head when he was down and then participated in drafting the charging documents overnight to charge Dr. Smith, even though these people from the AG's office or Mr. Abraham, whoever, shot the guy in the top of the head. And that's been a big problem with all of this from day one. And, I mean, it's probably. . . I think it's in the record in this court that Jim Hood, the attorney general, General Hood, showed up at the civil commitment hearing and he told the judge, well, this is the first time I've ever done one of these. And the reason is because they shot the guy, and they're trying to put it to bed by pinning it all on Dr. Smith and keeping him locked up, whether it be in jail or in the forensic unit at the state hospital. And, I mean, it's really mind-boggling, because even the guy that they've told us for five years shot the guy in the top of the head when we deposed him, this AG investigator, Larry Ware. He said, I don't know who shot him in the top of the head. So the further we get into it, the worse it gets. And so our position is, Your Honor, that these kinds of behind-the-scenes, underhanded conspiracies aren't the kind of things that you can just. . . Mr. Bell, your time has expired. Thank you, Your Honor. You will have three minutes on rebuttal. Thank you, Your Honor. Mr. . . . are you Mr. Hood? No, you're Mr. Matheny. Mr. Matheny. May it please the Court, Justin Matheny on behalf of the State Employees and Mississippi Department of Mental Health. The other defendants in the case, their attorneys have a few things to say after me, but I have a few points that I want to make, specifically starting with Heck. I believe it's clear that Heck applies in this civil commitment context. You've got the cases cited in our brief. I think Judge Reeves was correct to apply it in the civil commitment context. The big issue, and this was only touched on earlier, and I think with Judge Costa, the big issue is this argument about temporal and conceptual, or temporally and conceptually distinct claims. I could start with this, Judge Dennis. I believe that the reason why you believed that this may have been waived, and it's also the reason that Judge Reeves' order on the motions to dismiss did not address the temporal and conceptual distinct issue, is because he never raised it with Judge Reeves before Judge Reeves decided the order that was entered in October of 2016. He only brought that up when he came back on reconsideration of Judge Reeves' original dismissal order and argued that the claims were temporally and conceptually distinct. Now, the temporal and conceptual distinct argument that he's making relies on the notion that the LeFleur County Chancery Court civilly committed Mr. Smith in January of 2016, and he says that he's got claims that relate to things that took place before January 2016 and things that relate to after January 2016, and therefore he has claims that are temporally distinct. That's his argument. I appreciate it. The problem with that is you can't just focus on the January 2016 order and say that that's the only thing that the courts that were involved in this process were looking at and the only thing that it decided. There's an order before the January 2016 order from the criminal court, the circuit court in Mississippi, that provided that Smith would be held in the custody of the LeFleur County Sheriff until it could be – until the Chancery Court could adjudicate the civil commitment. Was he declared to be incapacitated, lacking the legal capacity to proceed? Incompetent to stand trial, I believe was the rule. He was. He still is. Right. And so he wasn't being held before his civil commitment illegally. He was being held pursuant to an order by the circuit court in LeFleur County. And so if you have a claim that's attacking his being detained before the civil commitment order, it's attacking that prior order. And I think I make that point in the brief, talking about after. Again, there wasn't just this one order in January of 2016. By my count, and these are all in the record, after the initial civil commitment order, there are at least five or six other orders that were entered by the LeFleur County Chancery Court initially, which was the court that committed him initially, and then the Hines County Chancery Court, which was the court where he had to go to complain once he had been to the state hospital. If you go through. But what about on the heck issue, some of the conduct? I know a lot of it relates to what kept him detained in the hospital or committed. But what about, for example, using the restraints? I mean, that's not really wrapped up in the commitment itself. So how would heck bar that? Well, I'm glad you brought me around to that because our position is it is wrapped up in the commitment, Your Honor. This is why. And I'll focus in on that particular claim. February of 2016. February of 2016 was when the Hines County Chancery Court issued an order that was basically a you remain civilly committed order. The response of Smith to that order was, first, to go out and file this 1983 lawsuit against everybody that he sued. And it was, second, to file another motion with the Hines County Chancery Court and assert all of these issues, including the restraint issue. So if you go in the record. But just because he filed them in State court, I mean, if they ruled on it, that would be preclusive. But that doesn't mean it's why does that get you to being heck barred? The question is whether it's an attack on the commitment itself as opposed to the conditions once he's committed, which in a normal heck situation. Right. I mean, you can't bring a 1983 to challenge your conviction for bank robbery. But you can bring a 1983 to say the prison guard beat the hell out of me in prison. I would agree with that broad statement, Your Honor. What I'm getting at here, and this is, I think it's fair to say, a rather unique circumstance that we have here. He's going to State court and he's saying that these things that maybe look like or sound like they would be conditions of confinement type issues. He's going to the State court and he's saying, you've got to let me out because of this. You've got to let me out because of the restraints. You've got to let me out because of the psychology treatment. This and that and that. He's arguing that to the State court and the State court rejected that. The State court rejected all of those claims. He appealed initially, well, the Lafleur County Chancery Court orders he appealed. The Supreme Court affirmed those. He appealed the Hines County Chancery Court orders and specifically the order that deals with the restraints and the other issues that he's arguing are conceptually distinct. And by that time, it was only three months after the July 2016 Hines County order where the Tulane doctors did their evaluation. They determined that he could go to still remain civilly committed, but go to outpatient treatment with the laundry list of restrictions that's included there in the order that's in the record. If we think it's not HECBARD, say the one about the restraints being applied, what other defense? I mean, your attorneys were found immune by Judge Reeves, right, prosecutorial immunity. What other defenses would you have if it's not HECBARD? There were several immunities involved. And I think that specifically with the restraints issue, the immunity that's going to come into play is the immunity that relates to the defendants. Like in an ordinary case, you would think of like the sheriff's office or someone who is responsible for the custody of a defendant. But in this case, it's the state hospital and the director of the hospital that's responsible for his custody. What this restraint claim is, and if you look at the complaint, you can see this, his argument is that he was put in restraints to be carried to and from the courthouse for his hearings and his civil commitment proceedings. And he says that that's a violation of Mississippi Code 4121-1021 because it's not noted in his clinical chart that he was put in restraints before he was sent to the courthouse for his hearing. Would it violate the Constitution, though? I mean, that's what 1983 is about. I would submit that it certainly does not, Your Honor. But the point being is, is that the immunities, which I take as conceded here since he didn't even bother to respond to those at all, the immunities cover some of the claims. The Eleventh Amendment covers some of the claims. Let me touch on that before I leave. And then Heck bars all the claims, because they, if you go through and you trace each claim, they all relate to things that were litigated previously and decided against them. Now, there may be plenty of other reasons that they're, they may fail to state a claim. We might have Rooker-Feldman issues. We might have collateral estoppel, race judicata issues. But the deal is, is that Judge Reeves is a very careful person. He's a very careful jurist. He went through, he was presented with things, and at the time he was presented with them, this was the call that he made. It brings me around to what I wanted to do, the last point about the Eleventh Amendment. And that's where you in, and I appreciate the candor, that's where you seem to recognize there was, the district court did make it a little too simple. Yes, and I'd like to explain why. The reason why was this. When we got the complaint in, we see 1983 claims against a bunch of State actors. We see so-called ADA claims against State actors and the Department of Health. And we see State law claims against State actors and the State Department of Health. Well, any time we get a case like that into the Civil Division, the first thing we do is we say, you can't sue the Mississippi Department of Mental Health in federal court on State law claims. That's just a direct Pennhurst problem. You also can't sue under 1983 and get damages. And they're not even, it's an arm of the State. It's not even a person for purposes of 1983. So when we moved to dismiss with Judge Reeves, that was what our motion was limited to. We said, look, the Eleventh Amendment bars you from tagging the Mississippi Department of Mental Health on any State law claims or any 1983 claims. Well, his argument coming back to that was that you've waived it because you take federal funds. And frankly, I don't know what he's talking about. I think he's talking about some kind of analysis that you do when there's a Rehabilitation Act issue that's involved. But nevertheless, I know that it's much more complicated to get to the bottom of whether the Eleventh Amendment bars ADA claims than it is when you're having State law claims or 1983 claims. So we didn't raise that issue with Judge Reeves. We just said we'll rest on our other defenses as to why the ADA claims against the Department will be thrown out. But if the opportunity ever presented ourself, and I submit that it should not, but if it does, then we would go through the United States v. Georgia analysis and whether or not it violates the Fourteenth Amendment and the ADA or just the ADA and not the Fourteenth Amendment and go down that road. But I think that we would have to do that after some more extensive legwork if we had to. You're not telling us you haven't briefed all the issues that he's raised or that are properly raised here. No, Your Honor. We've briefed more issues than he's raised because he failed to say anything about our immunities, and we went in and briefed that to the T. And we've also addressed all the other points. I don't feel the need to address some of this, what I consider way off-base points such as that the court didn't take the allegations and the complaint as true like it was supposed to. Well, of course it didn't. You have fully addressed the issue of ADA claims and you're asserting sovereign immunity and lack of individual liability. You've briefed all of those issues. Oh, yes. The issues such as like the Lollar v. Baker case and the cases of Nottingham v. I thought you were saying we have to go do some more legwork. Not as to the individuals, Your Honor. The individuals, he has no claim under the ADA or anything. They have no individual liability for that. And, Your Honor, I would respectfully submit that we should not have to go do any more legwork with this in the case that Judge Reeves' decision should be affirmed. If there is anything left, then I think it would have to be something that would be against the Department and something related to those ADA claims and that issue. Okay. Thank you, sir. Mr. Bell, you have three minutes on rebuttal. I'm sorry. There's other attorneys. Oh, I'm sorry. I'm sorry. I'm getting way ahead of myself here. Mr. Chapman is next. Yes, Your Honor. May it please the Court, my name is Jamie Jax. Jamie Jax. Yes, sir. I'm here on behalf of Mr. Ralph Chapman and the other private attorneys are here represented as well. Many of the arguments that I'll make will be applicable to them as well. Your Honors, quite simply, as the Court already has pointed out, heck is a bar to all of the claims made against the private attorneys in this case, Mr. Chapman, Mr. Spraggans, Mr. Abraham, and Mr. Tucker. As the Court asked Mr. Bell to do, he cannot articulate how in the world these private attorneys would be involved in the alleged constitutional deprivations that occurred well after the December 2014 commitment hearing. The only allegations that are directed at Mr. Chapman and Mr. Spraggans related to the 1983 claims are directly related to a December 2014 LeFlore County hearing. The sum total of the allegation is that Mr. Chapman and Mr. Spraggans, somehow by phone, participated is the words that are used in the amended complaint in that hearing. Well, Your Honors, Heck v. Humphrey, of course, bars any 1983 claims unless and until that commitment proceeding, the order arising out of that December 2014 hearing and subsequent January 2015 order, which directed the commitment of Dr. Smith. Unless and until that's overturned, Heck will bar the 1983 claims against Mr. Chapman and Mr. Spraggans and the other private attorney defendants. In fact, Dr. Smith What claims do you think were asserted? I mean, it's a little hard to tell from the complaint. My review says what's asserted against the private attorneys is the pursuit of involuntary, inpatient civil commitment violated due process and equal protection, that that's really the only allegation, and then I guess it's civil conspiracy. But what's your read on what are the allegations against your private attorney clients? As I read the record on page 153 of the amended complaint, the sum total is that somehow Mr. Chapman and Mr. Spraggans conspired to delay the civil commitment proceeding that took place in December of 2014 and resulted in the January 2015 commitment order. Your Honors, that commitment order has been appealed up by Dr. Smith to the Mississippi Supreme Court. That's in cause number 2015, Supreme Court, Mississippi 1163. He makes the exact same due process violation contentions in that proceeding as he's making here, and the Supreme Court, by a procurium affirmance, affirmed that order, Your Honors. So we would argue he's precluded from bringing that claim, period, that those due process violations that are alleged are inextricably intertwined with that January 2015 order, which has never been overturned, and that's the sum total of the allegations against the private attorneys, as I read the complaints. I see my time is up, and I'll briefly allow my other attorneys here to make some comments on their client's behalf. Thank you, Your Honors. Thank you. Mr. Kelly. May it please the Court. Michael Kelly here on behalf of Albert Lee Abraham, Jr., Your Honor. There were initially two issues that I was prepared to speak on today. One of those issues was the default issue that was raised as issue number four in the appellant's brief, and that was we entered a stipulation, a joint stipulation, a withdrawal of that issue on November 27th. So that issue has been taken off the table. I will not be addressing it, although it is addressed in the brief. The second issue I would like to address is an issue that was raised by the appellant on rebuttal in his reply brief. He asserts that the joinders filed both by Mr. Abraham and Mr. Spragins and Mr. Tucker were insufficient to effectively adopt the arguments of both the state defendants, perhaps more importantly of Mr. Chapman, who filed a brief briefing all of the issues that have been raised by the appellant. Rule 28I allows such a joinder, and the standard is if the arguments are equally applicable to the adopting co-parties, then those joinders are allowed in the interest of judicial efficiency, so you don't have to read three more 50-page briefs asserting the same arguments. The only limitation on that is, which was not mentioned in the reply brief by the appellant, is if there are fact-specific, if the claims or arguments rely on something fact-specific, then they may not be adopted with a simple joinder. There needs to be some explanation. As we've seen here today, we do not have that. There were no specific, very few if any specific facts alleged against Mr. Abraham and very few against any of the other private attorneys in this case. I see my time is up, Your Honor. Thank you. Thank you. Mr. Merrill Nordstrom. Ms. Merrill Nordstrom. Good morning. My name is Merrill Nordstrom, and I'm here to represent Mr. Spragans and Mr. Tucker in this case. Mr. Spragans and Mr. Tucker, along with Mr. Chapman, were retained by Mr. Abraham to represent him in a civil case against Mr. Smith or Dr. Smith. I fear I may regurgitate many of the arguments made by a co-counsel. I hate to do that, but I would hate for anybody to allege that I have waived any arguments by not getting up here and saying a few matters. I did want to point out that in the appellant's brief, he does not point out any allegations against Mr. Spragans and Mr. Tucker specifically. But nonetheless, I'm here. I would like to just share. And Judge Reeves found your clients had immunity as witness immunity? I believe so, Your Honor. Is that right? Yes. Dr. Smith has failed to state a claim for which relief can be granted against Mr. Spragans in his 1983 claim. Plaintiff alleges that Mr. Spragans, he doesn't mention Mr. Tucker, conspired with state actors to bring about the delay in the civil commitment, thus depriving him of his due process. According to Priester v. Lowndes County, a plaintiff must show in his pleading, where there is an allegation of conspiracy between state and non-state actors, that there must be an agreement. Smith not only doesn't allege any specific facts as to such an agreement, he doesn't even allege there was an agreement. And for those reasons, Your Honor, I believe that the district judge's ruling should stand. I have a question. Really, I guess I could have asked any of you all. But Judge Dennis brought up this point about if Dr. Smith is incompetent, how can he file a lawsuit? And the complaint I have in front of me just shows he brought it in his own name, not that his wife or anyone else brought it on his behalf. Has that been an issue in this case? Or if you want to respond to what plaintiff's counsel said, that that's not really a problem. No, I do believe that's a problem. I cannot speak right now if that's been raised at any time along this litigation. But, no, it was a complaint brought by Mr. Smith and it's not signed by his wife. And normally, I mean, you're understanding in Mississippi, if you're incompetent, someone has to bring a suit on your behalf. That's correct. Thank you. Thank you. Okay. Now, Mr. Bell, we'll hear from you on rebuttal. Thank you, Your Honor. Your Honor, on rebuttal for the appellant, Dr. Smith, the one thing I think may get lost in the complexity of all this is in just cutting to the chase. And one place we're in right now is that we have to assume that all of the allegations in the amended complaint are true. If they're plausible. If they meet the Twombly and Iqbal standard, yes, Your Honor, if they're plausible. And taking all of the allegations as true, then these allegations support every claim. There must be allegations of fact. Yes, Your Honor. You've got a lot of conclusions in there that I'm not sure are, I'm not sure what effect they have. Well, there's a lot of factual allegations. One example is I think Exhibit A to both complaints is the Department of Justice letter from their investigation of the Department of Mental Health. And we adopted those allegations as an exhibit and end to the complaint. And that's one example of all of those are assumed in the context of this case to be true. And we believe them to be true or we wouldn't have attached the letter. And the, I want to touch on this immunity issue. The immunity issue hasn't been conceded. Judge Reeves dismissed the case as being barred by HECC. I think it's footnote two in the October order. He said, well, if I wasn't dismissing it because of HECC, then I would probably dismiss it because of immunity. But our argument is immunity doesn't even apply because the Attorney General lawyers who were at the December 4th rolling court hearing weren't even in the case yet. Where in your brief does it challenge the immunity footnote, alternative holding in a footnote? Yeah. Does your brief challenge that at all? It doesn't challenge the footnote because it wasn't a basis for Judge Reeves dismissing the complaint. He just said, even if I wasn't going to bar it, dismiss it for HECC, then I would do that. But even then. That's alternative holding. Our position is they don't have immunity just by showing up at a hearing when they're not even in a case to argue that somebody ought to be locked up illegally. They don't have immunity for that. His lawyer is not even allowed in the room for over an hour. So that's part of the problem, Your Honor. It kind of goes back to what you asked earlier. What's the conspiracy? Well, the judge said everybody go meet and figure something out. And they didn't want the person who sued them now three or four times. That surprises you. Well, we hadn't sued them at that point. And the fact that Mr. Chapman represented to the court and he was there to observe and then he goes and meets with all these people and they won't even let me in the door, that's – You've got to do the best you can do. That's, I guess, all I can say about that. But they don't have immunity. These AG attorneys don't have immunity. Thank you, Mr. Powell. Thank you, Your Honor. Thank you. Your time is expired.